# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| DEBORAH LYNN KOZIOL, | |
| Plaintiff, | Case No. 19-CV-4068-CJW-KEM |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION |
| Defendant. | |

_____

At issue in this Social Security appeal is whether substantial evidence supports the Commissioner of Social Security's decision that Plaintiff Deborah Lynn Koziol held herself out as married to her ex-husband. I recommend **affirming** the Commissioner's decision.

## I. BACKGROUND

Koziol began receiving supplemental security income (SSI) benefits in 1998 after being found disabled as a result of her bipolar disorder. *See* Doc. 15. Because SSI (unlike disability insurance) "is a needs-based benefits program," the Social Security Administration "considers an applicant's income and resources" when determining the amount of SSI benefits, if any, to award to a disabled claimant. *Beaty v. Berryhill*, No. 2:18-cv-00519 AC, 2019 WL 2103422, at *2 (E.D. Cal. May 14, 2019). The Social Security Administration attributes income made by a claimant's spouse to the claimant, meaning a disabled person will be ineligible for SSI benefits if the claimant's spouse makes too much money. *See* **42 U.S.C. § 1382(a)**; **20 C.F.R. §§ 416.1160-416.1169**. If a claimant lives with and receives support from a person other than the claimant's

spouse—such as a parent, significant other, or friend—that person's income is not attributed to the claimant. Instead, the claimant is still entitled to benefits, but those benefits are subject to a one-third reduction. *See Detrick v. Callahan*, 115 F.3d 573, 574 n.2 (8th Cir. 1997); **20 C.F.R. § 416.1131**. Importantly to this appeal, the Social Security Administration's definition of "spouse" does not require legal marriage and includes those who live together and "hold[] themselves out" as married. **42 U.S.C. § 1382c(d)(2)**.

In her initial application in early April 1998, Koziol reported being separated from her husband, Thomas Koziol (who I will refer to as Thomas to avoid confusion with the claimant), since January 1998. AR 27-29, 154. She noted that a divorce was pending and that she had been living with a friend named Alan Reynolds, who supported her. Shortly thereafter, on April 13, she reported she had begun living on her own in an apartment on 27th Street in Omaha. *Id.* She stated that her husband Thomas had paid the first two months of her rent, which was $300 a month and included utilities. *Id.* She reported Thomas had also purchased $50 worth of food for her, and she began receiving food stamps on May 1. *Id.*

The Social Security Administration periodically conducts redetermination reviews to ensure that a claimant's circumstances have not changed and that they are still entitled to benefits. In September 1998, the Social Security Administration conducted a redetermination review by phone and then mailed Koziol the changes, which she signed off on. AR 36-40. Koziol indicated that her divorce became final on August 25, 1998. AR 36. Koziol reported that she had lived in the 27th Street apartment from April to June and then moved to an address on Burdette Street (which was the same address she had reported living at with Reynolds). AR 37. She indicated that the Burdette Street address was an apartment and that she owned it, and she wrote "ok" next to the typed statement, "I live alone." *Id.* She also handwrote, "I now live alone," below her prior statement about living with Reynolds. AR 36. The Social Security Administration inputted Koziol's handwritten changes into a typed statement (which was not resent to

2

Koziol), and in doing so, it changed the substance of what Koziol had said—for example, the typed statement eliminated reference to Koziol ever living at the 27th Street address, instead indicating that she had lived at the Burdette Street address with Reynolds and then moved on April 15 to the Burdette Street address. AR 33-35.

An unsigned redetermination form dated September 6, 2002, indicates that as of July 2, 2002, Koziol lived at an address in Phoenix. AR 41-45. It reflects that she lived alone and paid $400 a month in rent. *Id.* But a Social Security Administration note from September 11, 2002, reflects that Koziol reported a roommate "as of" September 2, stating that she and the roommate shared monthly rent of $800, making her rent $400. AR 154.

An unsigned redetermination form dated June 14, 2013, indicates that Koziol reported living alone at the Phoenix address from July to November 2002; that she reported living alone at a different Phoenix address from November 2002 to May 2004; that she reported living alone at a Tempe, AZ, address from May to September 2004; that she reported living alone at an Omaha address from September 2004 to May 2006; and that she reported living alone at an address in Battle Creek, IA, beginning in May 2006. AR 96-97. A Social Security Administration note from May 6, 2006, reflects that Koziol reported renting the Battle Creek, IA, home "from [her] ex-husband" for $250 a month. AR 71. She also reported: "Thomas stays at this home [in Battle Creek] a couple of days per week but he mainly stays at an address in Sioux City because that is where he works. When he does stay we are not living as man and wife." *Id.* This information, like the 2002 note reflecting Koziol reported a roommate, does not appear in any redetermination form.

Koziol received full SSI benefits from 1998 to 2016 based on the Social Security Administration's belief that she lived alone. On May 18, 2016, the Social Security Administration called Koziol to confirm that her circumstances had not changed and that she was still entitled to benefits. *See* Doc. 15; AR 106-15. The Social Security Administration mailed Koziol a written summary of the redetermination information from

3

Case 5:19-cv-04068-CJW-KEM    Document 20    Filed 01/21/21    Page 3 of 19

that phone call. *Id*. Upon receipt of the written summary, which repeatedly noted Koziol lived alone (as had the previous redetermination forms), Koziol visited the Social Security Administration armed with handwritten corrections to the redetermination. *Id*. She told two different Social Security Administration employees that she had lived with Thomas for the past nineteen years, and she repeatedly referred to Thomas as her "husband" (one employee noted specifically "[s]he does not refer to him as her exspouse"). AR 123, 166, 276-79, 290. Koziol denied ever stating that she lived alone or that she lived with Alan Reynolds, accusing the Social Security Administration of inputting lies about her on the redetermination forms. AR 276. In a rant, she said that someone at the Social Security Administration told her she could live with Thomas since they were divorced and did not have sex, as long as Koziol paid Thomas monthly rent;[1] that the Iowa Department of Human Services knew she lived with Thomas and instructed her not to tell the Social Security Administration, since it did not matter to the benefits determination; that she divorced Thomas in order to live with him and still receive benefits; and that she would file a lawsuit against the Social Security Administration for making her get a divorce if she could have been married to Thomas all this time and still received benefits. AR 166, 276-79. She also suggested that she did not divorce Thomas until 2002 when they lived in Arizona, stating that she would not have said a divorce was pending when she first applied for benefits in 1998 and that she did not live "with [Thomas] during the[] time they moved to Arizona until they were divorced." AR 270, 277.

Adding further confusion about the date of Koziol's divorce, in an application for DI benefits from June 2006, Koziol denied being married and stated she divorced Thomas on September 7, 1999. AR 21-22. To clear the matter up, the Social Security

---

[1] The Social Security Administration employees expressed incredulity that one of their colleagues ever told Koziol anything close to this, but the note from 2006 does reflect that Koziol reported renting a house from her ex-husband and that he stayed there a few nights a week; it seems likely this is the conversation Koziol was referring to.

4

Administration requested that Koziol provide evidence of her divorce. The divorce decree showed Koziol's divorce was finalized on August 25, 1998, as the Social Security Administration had previously understood (and as Koziol had reported in the September 1998 redetermination). AR 293-95. The decree contained standard language that Koziol's former last name "is restored to her," but this had been crossed out and initialed by Koziol. *Id.*

The Social Security Administration gathered evidence about Koziol's living situation and relationship with Thomas since 1998. Records from LexisNexis showed the same addresses associated with both names—one in Battle Creek; three in Phoenix; one in Tempe; and three in the Omaha area (including the Burdette Street address). AR 138-39, 140-41. Koziol had only one address since 1998 that was not in Thomas's report—in Phoenix, AZ, in 2007 (when she was living in Battle Creek, IA); and Thomas had three addresses that did not appear in Koziol's report—two in the Omaha area, beginning in 2004 and 2005, and one in Battle Creek from 2007. *See id.*

The Social Security Administration obtained Thomas's 2015 federal income tax return. AR 124, 129. Thomas filed as "single," not married, but he claimed Koziol as a dependent (on his accountant's advice). AR 129-30. He did not claim any rental income from Koziol, and he listed the Battle Creek address as his residence. *Id.* Other evidence of the pair's financial relationship included Koziol's handwritten comments on the May 2016 redetermination form, in which she noted Thomas was the beneficiary of her life insurance policy because "he ha[d] let [her] rent from him for 19 y[ea]rs" (the 2013 redetermination form reflects her life insurance policy, but not the beneficiary). AR 98, 110, 152-53.

The Social Security Administration also gathered treatment records in which Koziol talked about Thomas. An October 2004 treatment record reflects:

> Deborah just moved [from Phoenix to Omaha] with her husband. They had been married two years and divorced eight but have always lived together having never really been apart. . . . While living in Phoenix with her

5

> husband, she worked about six weeks in a pediatrician's office . . . . Her husband works in car sales. . . . Husband is gone quite a bit of the time with his job.

AR 288-89. A July 2005 treatment record described Koziol as a "homemaker" who is "divorced but . . . about to remarry her ex-husband." AR 286. A March 2006 treatment record reflected that Koziol wore a "simple silver band on her wedding finger." AR 280.

Based on this evidence, the Social Security Administration attributed Thomas's income to Koziol and stopped Koziol's SSI benefits. AR 156-60. It also determined that it had overpaid Koziol more than $100,000 in benefits over the years. AR 123, 257

Koziol requested reconsideration through "formal conference." AR 163. The Social Security Administration acquired Koziol's bank records from May 2014 to February 2016, reflecting Thomas routinely transferred money to her account, and no evidence Koziol paid Thomas $250 monthly rent (although she did pay utilities). AR 149-50, 177-247, 297. Koziol submitted a typed statement to the Social Security Administration in which she said that Thomas bought the Battle Creek house in 2006 and that she paid him $250 monthly rent, as well as paying all utilities. AR 170. She explained that Thomas transferred money to her account so that she could purchase household supplies—she stated that because Thomas worked, she traveled to Sioux City and Omaha to make all purchases for the home. *Id*. She said that Thomas gave her a "credit" on rent based on the purchases. *Id*. She stated that upon her release from the hospital in 1998, she and Thomas were going through a divorce, and she lived with Alan Reynolds. *Id*. She wrote:

> I was separated from Thomas and living with Alan Reynolds. We lived together in a place we rented for about 3 months when Alan moved out. Thomas moved in with me. At that point we moved back in together and have lived together ever since. . . . I came in to do corrections on the record[ ]because I had always lived with Thomas except for 3 months in 1998.

*Id*.

6

Case 5:19-cv-04068-CJW-KEM    Document 20    Filed 01/21/21    Page 6 of 19

Thomas also provided a written statement. AR 292. He indicated that Koziol lived with him as a roommate and that her rent was $250 a month plus utilities. *Id*. He stated that because he worked in Sioux City, he was not at the house "often." *Id*. He said that they purchased food separately—Koziol using food stamps—and that he put money into her account "to get things for the house." *Id*.

In October 2016, investigators with the Office of the Inspector General, investigating Koziol for Social Security fraud, visited her Battle Creek residence. AR 260-62. Thomas answered the door and said it was his day off. *Id*. The investigators observed Koziol watching television, in a room with a large photo of Koziol and Thomas on the wall that appeared to have been taken more recently than 1998. *Id*. Later, Koziol said that area was "Tom's area," and she was only there to show him pictures of her grandchildren—she explained that she had her own "living area," the living room. *Id*. Investigators also observed a collection of DVDs in "Tom's area" that Koziol said were "special to her." *Id*. Koziol indicated that she had her own bedroom, and she denied living with Thomas as husband and wife, noting that Thomas wanted to ensure she was safe and "to help take care of" her because he "has a heart." *Id*. Koziol noted that Thomas was her emergency contact. *Id*. Thomas told investigators that he owned the car Koziol drove. *Id*. Thomas also said Koziol had stopped paying rent and utilities since her benefits stopped. *Id*. Investigators asked Koziol to show them her room, and she brought them to a room that appeared to be a guest room—it contained a washer and dryer and a single bed, which did not appear to be slept in, as it was made and had crafts sitting on top of it. In what Koziol stated was Thomas's room, investigators noted the unmade bed and female clothing folded on top of the dresser, including bras. *Id*.

Koziol's formal conference occurred in November 2016. AR 297, 353. She provided receipts that, according to her, showed the purchases she made for the house constituting her rent and the bank transfers from Thomas's account. AR 187-247, 297. The Social Security Administration employee noted that the receipts did not total $7,250 (twenty-nine months of rent) and that they included purchases for things like makeup.

*Id.*

The reconsideration decision was put on hold while the fraud investigation proceeded. Doc. 15. Koziol was charged in state court based on the overpayment of Social Security benefits. *Id.* In April 2018, she pleaded guilty to misdemeanor theft in an *Alford* plea, in which the defendant recognizes there is sufficient evidence to convict but maintains innocence. AR 317-19.

Once Koziol's criminal charges were resolved, the reconsideration decision issued in May 2018, affirming that Koziol and Thomas held themselves out as married. AR 325-28. Koziol requested a hearing before an administrative law judge (ALJ), writing that she disagreed with the redetermination decision because it "states no spouse income reported," but she is "not married." AR 329. Her lawyer submitted a brief before the ALJ, arguing that there was insufficient evidence that Koziol and Thomas had held themselves out as married. AR 352-56.

The ALJ, Jan Dutton, held a hearing in February 2019, at which Koziol testified. AR 361-62. At the hearing, Koziol stated (as she had all along) that the redeterminations were conducted by phone and that she had not seen any written redetermination forms saying she lived alone until May 2016. AR 384-85. She testified that she referred to Thomas as her roommate or ex-husband. AR 379. She stated that she paid Thomas rent in cash and that she paid all utilities, but the utilities were in Thomas's name alone, except one in both their names. AR 375. She denied telling people they were married, although she admitted "everybody assumes" they are married. AR 387. She also admitted that she and Thomas had talked about getting remarried, but she did not recall saying this to anyone in the community. AR 383. At the hearing, Koziol's attorney recognized that the evidence supported Koziol received support from Thomas (although he noted Koziol denied this fact), but he argued that the evidence did not support that they held themselves out as married. AR 365-66. Thus, Koziol's attorney suggested that Koziol had received an overpayment in benefits, but he argued that the overpayment should be calculated using the one-third reduction rule, rather than attributing Thomas's income to Koziol.

*Id*.

The ALJ issued a written decision in April 2019, concluding that Thomas "met the definition as the claimant's spouse for SSI purposes for the period from April 1998 through the date of the decision." AR 14-18. The Appeals Council denied Koziol's request for review of the ALJ's decision on August 15, 2019 (AR 5-7), making the ALJ's decision the final decision of the Commissioner. *See* **20 C.F.R. § 416.1481**. Koziol filed a timely complaint in this court seeking judicial review of the Commissioner's decision (Docs. 1, 4). *See* **20 C.F.R. § 422.210(c)**. The parties briefed the issues (Docs. 16-18), and the Honorable C.J. Williams, United States District Judge for the Northern District of Iowa, referred this case to me for a report and recommendation.

## II.   DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

At issue here is whether substantial evidence supports the ALJ's determination that Thomas met the Social Security Administration's definition of Koziol's spouse. By statute, "if a man and woman are found to be holding themselves out to the community in which they reside as husband and wife, they shall be so considered for purposes" of

9

determining entitlement to SSI benefits. **42 U.S.C. § 1382c(d)(2)**.[2] The regulations further provide:

> We will consider someone to be your spouse (and therefore consider you to be married) for SSI purposes if . . . [y]ou and an unrelated person of the opposite sex are living together in the same household at or after the time you apply for SSI benefits, and you both lead people to believe that you are husband and wife.

**20 C.F.R. § 416.1806(a)(3).** When a claimant has a roommate, the Social Security Administration requires that the claimant explain the relationship and "answer questions such as the following":

> (i) What names are the two of you known by?
> (ii) Do you introduce yourselves as husband and wife? If not, how are you introduced?
> (iii) What names are used on mail for each of you?
> (iv) Who owns or rents the place where you live?
> (v) Do any deeds, leases, time payment papers, tax papers, or any other papers show you as husband and wife?

**20 C.F.R. § 416.1826(c)(1).** Ultimately, the Social Security Administration "will consider you married to the person you live with unless the information [the Social Security Administration] ha[s], including the answers to the questions . . . , all considered together, show that the two of you do not lead people to believe that you are each other's husband and wife." **20 C.F.R. § 416.1826(c)(2)**.

The Program Operations Manual System (POMS), guidelines used by ALJs when processing claims,[3] also addresses how to make the holding-out decision. POMS SI

---

[2] "The heteronormative language of the statute and its regulations have not been updated to reflect the reality of marriage equality," but the Social Security Administration has recognized through informal guidance that these rules apply to same-sex couples as well. *Beaty*, 2019 WL 2103422, at *2 n.4.

[3] The Eighth Circuit has suggested that a claimant cannot claim error based solely on a violation of the POMs, as "the POMS guidelines have no legal force, and do not bind the Commissioner." *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (cleaned up) (quoting *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981)). The court has found error, however, when the ALJ failed to "consider the POMS guidelines." *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003).

10

Case 5:19-cv-04068-CJW-KEM    Document 20    Filed 01/21/21    Page 10 of 19

00501.150[4] provides:

> A marital relationship exists when two individuals resume living together after having lived together previously as a married couple. In such a case, we presume that the individuals are in a marital relationship unless they present evidence to the contrary. Evidence to the contrary includes evidence of a divorce or the termination of a holding out relationship. For example, if a divorced couple resume living together due to illness or for economic reasons with no intention of resuming a marital relationship, this represents evidence to the contrary.

And POMS SI 00501.152[5] indicates that in addition to the evidence set forth in the regulation to consider when determining if a holding-out relationship exists, the ALJ should consider:

- Mortgages, leases, property deeds, bank accounts, insurance policies, passports, tax returns, credit cards.
- Information (preferably documents) from other government programs, such as Temporary Assistance for Needy Families (TANF), the Supplemental Nutrition Assistance Program (SNAP), public housing, etc.
- Magazine or newspaper subscription labels, personal mail.
- Statements from relatives, close friends, or neighbors.

POMS SI 00501.152 also gives several examples of evidence constituting a holding-out relationship. It suggests a holding out relationship would exist based on evidence that two people live together, "filed tax returns as 'married filing jointly,'" share charge accounts, and do "not correct the neighbors when they refer to them as spouses." *Id.* On the other hand, because a holding-out relationship requires that *both* individuals present themselves as married, a holding-out relationship would not exist between two people who live together in a romantic relationship and plan to be married when both

---

The Eighth Circuit has also held that when the POMS provide the Commissioner's interpretation of an ambiguous regulation, the POMS may be entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). **Draper v. Colvin**, 779 F.3d 556, 560-61 (8th Cir. 2015).

[4] Available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0500501150.

[5] Available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0500501152.

11

individuals' names appeared on the lease, and one individual stated "they hold themselves out to the community as a married couple," but the other individual stated "she does not present their relationship to the community as that of a married couple and will not do so until they are married." *Id.*

Courts have had only a few occasions to address whether substantial evidence supported an ALJ's holding-out determination. Courts have held substantial evidence supported the ALJ's holding-out determination when *both* members of the relationship described the other as their spouses in numerous Social Security forms. *See Gibbons v. Comm'r of Soc. Sec. Admin.*, No. 2:10-cv-02880 KJN, 2012 WL 996534, at *4-5 (E.D. Cal. Mar. 23, 2012) (in addition to the forms, "wife" signed her name using the claimant's last name); *Smith v. Sullivan*, 767 F. Supp. 186, 188-89 (C.D. Ill. 1991) (in addition to the forms, treatment records reflected both referred to the other as a spouse), *aff'd sub nom. Smith v. Shalala*, 5 F.3d 235 (7th Cir. 1993). Courts have also affirmed the ALJ's finding of a holding-out relationship when the claimant reported such a relationship to the Social Security Administration for years, reversing course only once the claimant's benefits were stopped because of the spouse's income. *Cruz v. Comm'r, Soc. Sec. Admin.*, 724 F. App'x 875, 876-78 (11th Cir. 2018) (per curiam) (on redeterminations in November 2005, January 2006, and July 2010, claimant described holding-out relationship and indicated husband paid the mortgage on their home; when benefits stopped based on spouse's income, claimant claimed boyfriend-girlfriend relationship, not husband-wife relationship; and later during appeal process, described a roommate or landlord-tenant relationship and submitted recently entered lease between the pair, but admitted receiving some support from roommate, including rides to places and use of his phone),[6] *cert. denied sub nom. Cruz v. Berryhill*, 139 S. Ct. 187 (2018); *Medina v. Apfel*, 5 F. App'x 785, 786-87 (9th Cir. 2001) (memorandum) (claimant

---

[6] Some of the facts are taken from the report and recommendation in the district court. *See Cruz v. Colvin*, No. 15-14272-CIV-MARTINEZ/LYNCH, 2016 WL 11710254, at *1-2 (S.D. Fla. May 13, 2016), *report and recommendation adopted*, 2016 WL 11710260 (June 30, 2016).

deemed married in 1983 when first began receiving SSI benefits and instructed to inform the Social Security Administration of any changes in spouse's income; Social Security Administration discovered claimant did not report increase to spouse's income that made claimant ineligible for benefits from 1990-1992; and although claimant and her spouse then denied a spousal relationship for those years, ALJ could find this testimony not credible when claimant continued to live with spouse, she reported a spouse on Social Security forms in 1983 and 1986, and spouse claimed claimant as dependent on taxes in 1989 and 1990).

When the claimant reported a holding-out relationship only a single time, in one Social Security form, a court has upheld the ALJ's holding-out finding when additional evidence existed that the claimant held herself out as married. ***Wilson v. Heckler***, 617 F. Supp. 899, 900, 902 (D. Mont. 1985) (claimant referred to herself as "Mrs. Robert Wilson" and wore a wedding ring). But a court has reversed an ALJ's holding-out finding based on reports of a spouse in Social Security forms when the evidence established no romantic or financial relationship between the claimant and the mother of his child, who he lived with. ***Brown v. Apfel***, No. 98 CIV. 2915 HB, 1999 WL 144515, at *2-4 (S.D.N.Y. Mar. 16, 1999) (although claimant marked that his roommate and mother of his child was his "spouse" on a Social Security form, he suffered from borderline intellectual functioning, and a witness testified he asked her the meaning of the word "spouse" after being awarded benefits; further, the evidence established that claimant and mother of his child slept in separate bedrooms; dated other people; referred to each other as roommates; maintained separate names; had separate bills, bank accounts, and credit cards; did not own any life insurance policies; and each paid half the rent). In other cases in which the only evidence of "holding out" appeared on a single Social Security form, courts have split on whether an intertwined financial relationship is sufficient additional evidence to support an ALJ's holding-out finding. *Compare* ***Dutko v. Colvin***, No. 15-CV-10698, 2015 WL 6750792, at *1, *3 (E.D. Mich. Nov. 5, 2015) (affirming ALJ's holding-out finding when claimant checked boxes on initial Social

13

Security application that described her roommate as her "spouse" and later, as an "other relative," and that indicated they presented themselves as married; claimant told two Social Security representatives that she received health insurance through her "live in boyfriend" by listing themselves as in a "domestic partnership" for purposes of health insurance; claimant and partner owned home together and were both listed on the deed and mortgage; and claimant received financial support from partner), *with* **Beaty**, 2019 WL 2103422, at *1-5 (reversing ALJ's holding-out finding when claimant indicated in redetermination form that she held herself out as married with her roommate and father of her children, but described her roommate as a "non-relative" in prior Social Security forms; both described the other as a "friend" and denied a romantic relationship; investigation revealed no further evidence that "the two were known by the same last name, were listed on documents as husband and wife, or represented to others that they were married"; and the two shared a bank account, vehicles, and moved together to multiple states).

Only one court has addressed whether substantial evidence supported an ALJ's holding-out finding when the claimant never reported a holding-out relationship to the Social Security Administration (as here). In *Dillow v. Berryhill*, No. 3:17-CV-00353-DW, 2018 WL 1057025, at *2 (W.D. Ky. Feb. 26, 2018), the Social Security Administration began investigating whether the claimant held herself out as married with her roommate when they discovered the claimant had changed her last name to her roommate's almost twenty years earlier. In addition, a few years prior to discovering the name change, the Social Security Administration had learned of a joint checking account shared by the two, but the pair had removed the claimant's name from the account when they were informed the claimant's benefits might be affected. *Id.* at *1-2. At that time, they explained that they had dated "on and off" for years and that the claimant only used the credit card for the joint account when they were together or when she ran errands on her partner's behalf. *Id.* at *2. When asked about the last-name change, however, the claimant stated she changed her last name because if they had married, "she would

14

have lost her SSI . . . benefits." *Id.* The Social Security Administration's investigation also revealed that the claimant's partner had claimed her as a dependent on three prior federal tax returns, that they jointly owned a vehicle, and that they jointly owned a home in which the deed identified them as "husband and wife." *Id.* at \*2, \*6. The Social Security Administration had both the claimant and her partner complete a marital relationship questionnaire, and they both stated they introduced each other to family and friends as "girlfriend," "boyfriend," or "fiancé." *Id.* at \*2. The Social Security Administration did not credit their questionnaires, finding a holding-out relationship existed and stopping benefits. *Id.* The ALJ affirmed, despite the claimant's hearing testimony that her partner was gay and used their relationship to avoid outing himself to his family, and that she changed her last name because her father had sexually abused her, and she did not want his last name. *Id.* at \*3. The court affirmed the ALJ's holding-out finding. *Id.* at \*8-9.[7]

Here, as in *Dillow*, substantial evidence supports the ALJ's holding-out determination. As the ALJ noted, Thomas and Koziol had a "fairly cohesive financial relationship." AR 17. They have lived together for more than fifteen years, moving together from Omaha to Arizona and back to the Midwest. Thomas owned their Battle Creek home and paid the mortgage, while Koziol paid the utilities, all but one of which were in Thomas's name alone. Thomas also owned both the vehicles they drove. Although Koziol and Thomas maintained separate bank accounts, Thomas routinely transferred money to Koziol's account, and he claimed Koziol as a dependent on his 2015

---

[7] *See also* **Vickers v. Harris**, No. CV 3-79-479, 1980 WL 8767, at \*1 (E.D. Tenn. Feb. 29, 1980) (when addressing the constitutionality of the holding-out provisions, noting the ALJ found a holding-out relationship when the claimant retained her own name, but if people referred to her by her boyfriend's last name, she did not correct them; merchants in the community believed the claimant and her boyfriend were married; the claimant's boyfriend filed a joint tax return indicating they were married and claiming the claimant as a dependent; and they owned a home together as joint tenants).

tax return. In addition, Koziol listed Thomas as her emergency contact and as the beneficiary of her life insurance policy.

I agree with Koziol that the holding-out standard requires more than an intertwined financial relationship. Many couples live together, share children together, and support each other financially, but are not viewed as "married" by contemporary standards. As the court in *Beaty* noted:

> The [Social Security Administration] has chosen "holding out as married" as the standard for spousal deeming. Whether some other standard would better serve the purposes of the statute, or better address the variety of contemporary relationships and mutual-support arrangements, is not a question for this court [or the ALJ].

*Beaty*, 2019 WL 2103422, at *5. Nevertheless, financial evidence may still be considered by the ALJ when determining whether a holding-out relationship exists. And here, such evidence was especially relevant because both Koziol and Thomas submitted statements indicating that they are financially independent, that Koziol pays Thomas $250 monthly rent, and that they refer to one another as roommates. The financial evidence bolsters the ALJ's decision to discredit Koziol's and Thomas's statements about the nature of their relationship, as Koziol's bank records do not support that she paid Thomas rent, and Thomas claimed Koziol as a dependent on his tax returns (and did not report any rental income).[8]

---

[8] In addition, the ALJ could discredit Koziol based on evidence that she tried to hide her relationship with Thomas from the Social Security Administration because she knew it would affect her benefits: she signed a September 1998 redetermination form indicating that she lived alone (both typed by the Social Security Administration and handwritten by Koziol), even though the evidence establishes that she was living with Thomas by that point; she reported in 2006 that Thomas stayed with her "a couple of days per week," rather than that Thomas lived with her and that her residence was his primary address; she told a Social Security Administration employee in May 2016 that she divorced Thomas to obtain benefits and that the Iowa Department of Human Services told her not to tell the Social Security Administration she lived with Thomas; and she and Thomas told investigators in October 2016 that they maintained separate living areas and bedrooms, even though a tour of the house suggested otherwise.

16

Here, the ALJ's holding-out finding did not rest solely on financial evidence. An October 2004 treatment record reflects that although Koziol explained that she and Thomas were divorced, she noted they had never been apart, and she referred to Thomas as her husband. A March 2006 treatment record reflects she wore a ring on her wedding finger. And in 2016, when Koziol went to the Social Security Administration office to correct the redetermination form, two employees separately noted that she repeatedly referred to Thomas as her husband.[9] At that time, she also expressed confusion about the date of their divorce, indicating they divorced in 2002 when they actually divorced in 1998, suggesting that the divorce had no impact on their relationship. She also stated that they divorced so that she would be eligible for SSI benefits. In addition, Koziol and Thomas shared the same last name, and Koziol admitted at the hearing that "everybody assumes" they are married. Based on this evidence, the ALJ could find that Koziol and Thomas led people to believe that they are husband and wife.

There is some evidence supporting a contrary conclusion. Koziol reported to a provider in July 2005 that she was divorced but about to remarry her ex-husband (referring to Thomas as her ex-husband, rather than her husband). Although Thomas claimed Koziol as a dependent on his tax return, he filed as a single person, not as a married couple. Koziol also referred to Thomas as her "roommate" or "ex-husband" on Social Security redeterminations in 2002 and 2006, and she denied being married on a DI benefits application in 2006. But the ALJ could find Koziol's statements to the Social Security Administration entitled to little weight, as she knew that a holding-out relationship could affect her benefits. And the substantial-evidence standard requires a court to affirm even if the ALJ could have come to a contrary conclusion. Here, the

---

[9] Koziol ignores this evidence. She argues that the only evidence in the Social Security Administration records that Koziol referred to Thomas as her husband comes from Koziol's 1998 statement in her initial disability application, before she and Thomas divorced, which is repeated in redetermination forms from later years. But notes from the two Social Security employees who Koziol met with in May 2016 both indicated that Koziol referred to Thomas as her husband during those conversations. *See* AR 123-25, 166, 276-79, 290.

17

ALJ could find that the weight of the evidence supported that Koziol and Thomas held themselves out as married.

Koziol notes that the regulations require evidence that *both* Koziol and Thomas held themselves out as married. *See* **20 C.F.R. § 416.1806(a)(3)**; **POMS SI 00501.152**. She argues that even if the evidence establishes that she referred to Thomas as her husband, no evidence establishes that Thomas referred to Koziol as his wife. But as noted above, the ALJ could discredit Thomas's statement about how he presented their relationship, since he did not even admit providing any financial support to Koziol. The ALJ could find Thomas led people to believe he and Koziol were married based on his attempt to hide the nature of their relationship, the financial evidence, that they shared a last name, and that Koziol testified everyone assumed they were married. I recommend finding that substantial evidence supports the ALJ's decision that Thomas constitutes Koziol's spouse for the purpose of determining Koziol's eligibility for SSI benefits.

The ALJ also noted that Koziol and Thomas "are also presumably common law married" under Iowa law. AR 13. I need not address Koziol's challenge to this finding, as the Social Security Administration's holding-out standard applies irrespective of whether a person is considered married under state law. *See* **20 C.F.R. § 416.1806(a)** (noting the Social Security Administration will consider a claimant married if (1) the claimant is "legally married under the laws of the State where your and his or her permanent home is" or if (2) the Social Security Administration's holding-out rules apply). Thus, any error in determining Koziol and Thomas have a common law marriage under Iowa state law is harmless. To the extent Koziol argues that Iowa caselaw supports that the ALJ's holding-out finding under the Social Security Administration's standards should be reversed, I disagree. To establish a common law marriage under Iowa law, the party claiming marriage bears the burden of proof, and such claims are "carefully scrutinized." *In re Marriage of Martin*, 681 N.W.2d 612, 617 (Iowa 2004). On the other hand, here, Koziol bears the burden of establishing that she and Thomas are *not* married, and the court considers the evidence under the deferential substantial-evidence

standard. *See* **20 C.F.R. § 416.1826(c)(2)**; **POMS SI 00501.150**. Accordingly, I recommend following the federal district court cases addressing the Social Security Administration's holding-out standard and affirming the ALJ's decision.

### III. CONCLUSION

I recommend that the district court **affirm** the Commissioner's decision and enter judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. **Fed. R. Civ. P. 72**. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**ENTERED** this 21st day of January, 2021.

*Kelly K.E. Mahoney*
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa